NO.  14-~~722~~ 1722

In The

# United States Court of Appeals
For The Fourth Circuit

JUDITH SAMS, individually and on behalf of a class of similarly situated persons,

Plaintiff-Appellant

v.

ENTRUST ARIZONA, LLC now known as Vantage Retirement Plans, LLC; THE ENTRUST GROUP, INC.; ENTRUST ADMINISTRATION, INC.; HUGH BROMMA; FIRST TRUST COMPANY OF ONAGA; MECHANICS BANK; JUAN PABLO DAHDAH,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OPENING BRIEF OF APPELLANT JUDITH SAMS

LAW OFFICES OF LOUIS M. LEIBOWITZ
Louis M. Leibowitz (Bar No. 17654)
401 E. Jefferson Street, Suite 201
Rockville, MD 20850
phone: (301) 279-0224; Facsimile: (301) 279-0225

SNYDER ♦ DORENFELD, LLP
David K. Dorenfeld and Michael Brown
5010 Chesebro Road
Agoura Hills, CA 91301
Phone: (818) 865-4000; Fax:  (818) 865-4010

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
#118, 1440 Coral Ridge Drive
Coral Springs, FL 33071
Telephone: (954) 332-1143; Facsimile: (800) 305-2351

Counsel for Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1722__    Caption: __Sams v. Entrust Arizona, LLC, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Judith Sams__
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
(signature)                                              (date)

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF CORPORATE DISCLOSURE AND

INTERESTED PERSONS…………………………………………………..i

TABLE OF AUTHORITIES……………………………………..………iii

JURISDICTIONAL STATEMENT………………………………….…..1

STATEMENT OF THE ISSUES………………………………...…...1

STATEMENT OF THE CASE AND RELEVANT FACTS…………………...…1

STANDARD OF APPELLATE REVIEW……………………………...…10

SUMMARY OF ARGUMENT……………………………………...…11

ARGUMENT……………………………….………………..………...…12

I.    The district court erred in dismissing the Second Amended Complaint for failure to state a cause of action for breach of contract or, alternatively, rescission since Sams' Custodial contracts with each of the Defendants were void *ab initio* because they lacked a lawful Self-Directed IRA ("SDIRA") Custodian; there was no mutual assent of the parties to the terms of the SDIRA Custodial contracts; and the Defendants never intended to and did not act as "passive" SDIRA Custodians and administrators.

II.    The district court erred in finding that the substantive allegations in the Second Amended Complaint failed to state a cause of action for conversion, fraudulent concealment, and breach of fiduciary duty/constructive fraud.

CONCLUSION……………………………………………………...…29

REQUEST FOR ORAL ARGUMENT…………………………..……..29

CERTIFICATE OF COMPLIANCE………………………………....31

CERTIFICATE OF FILING AND SERVICE………………….…...…..32

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Barnett Bank of West Florida v. Hooper*, 498 So. 2d 923 (Fla. 1986)………………………………………………………….........27

*Crawford v. Mindel*,  57 Md. App. 111, 120 (1984) …………………………………………………………….……………...23

 CTI/*DC, Inc. v. Selective Ins. Co. of Am.,* 392 F.3d 114, 123 (4th Cir. 2004)……………………………………….………………..19

*Darcars Motors of Silver Spring, Inc. v. Borzym*,  379 Md. 249 (Md. 2004)……………………………………………………… …..23

*Flood v. New Hanover Cnty.,* 125 F. 3d 249, 251 (4th Cir. 1997)………..…10

*Giarratano v. Johnson,* 521 F. 3d 298, 302 (4th Cir.2008)……………...……10

*Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999)………………………………………………..………11

*McCauley v. Home Loan Investment Bank,* 710 F.3d 551, 560 (4th Cir. 2013.)……………………………………………………29

*Midler v. Shapiro*, 33 Md. App. 264, 364 A. 2d 99 (1976)……………………………………………….………..24

*Patsos v. First Albany Corp*., 433 Mass. 323 (2001)……………………………………………….……27

 *Peer v. First Fed. Sav. and Loan Ass'n of Cumberland,* 331 A.2d 299, 301 (Md. 1975)……………………………………….………....…19

*Scheve v. McPherson,* 44 Md. App 398, 406 (Md. Ct. Spec. App. 1979)…………………………………………….…...……24

*Smith v. Copeland*, 2010 U.S. Dist. LEXIS 51157 (N.D. Ga. May 21, 2010) …………………………………………….……....… 18

iv

*Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 207 (2009)

aff'd 679 F.3d 1109 (9th Cir. 2012)…………………………….…………14


**Statutes**

Internal Revenue Code (26 U.S.C.):

§408.......................................................................................14, 26

§ 4975.....................................................................................24, 25

28 U.S.C. §1332(d)(2)………………………………...………………1

28 U.S.C. §1291……………………………………………..………1

**Regulations**

26 C.F.R. §1.408(b) (2)………………………………………….………14

26 C.F.R. §1.408-2(e)(6)(i)………………………………………..…….21, 22

**Other Authorities**

Federal Rule of Civil Procedure:

9(b)........................................................................ *passim*

12(b)(6)………………………………………………………… 2, 10

Federal Rules of Appellate Procedure:

4(a)(1)………………….........................................................1

37 C.J.S. Fraud §2c………………………………………..…..…….…...…24

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 3d* § 1297, at 590 (2d ed. 1990)……………………………………...11

IRS Form 1096……………………………………………………….26
IRS Form 1099-R……………………………………………….....26
IRS Form 5305-A (rev. March 2002)……………………….………8, 9
IRS Form 5498…………………………………………………….....26, 28
Instructions for IRS Forms 1099-R and 5498, 4/12/13 ………………........26

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter pursuant to 28 U.S.C. §1332 (d) (2) (diversity) and the Class Action Fairness Act.   On June 19, 2014, the district court entered a final order dismissing the action as to all Defendants.  Plaintiff Sams filed her notice of appeal from this final judgment on July 17, 2014. This appeal is timely pursuant to Fed.R.App.P. 4 (a) (1). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in dismissing the Second Amended Complaint for failure to state a cause of action for breach of contract or, alternatively, rescission since Sams' Custodial contracts with each of the Defendants were void *ab initio* because they lacked a lawful Self-Directed IRA ("SDIRA") Custodian; there was no mutual assent of the parties to the terms of the SDIRA Custodial contracts; and Defendants did not intend to and did not act as "passive" SDIRA Custodians and administrators?

2. Whether the district court erred in finding that the substantive allegations in the Second Amended Complaint failed to state a cause of action for conversion, fraudulent concealment, and breach of fiduciary duty/constructive fraud?

## STATEMENT OF THE CASE AND RELEVANT FACTS

1

## A. Procedural History

Plaintiff Judith Sams ("Sams") filed this putative class action suit in May of 2013 arising out of damages she sustained from investment losses through a Self-Directed IRA ("SDIRA"). Joint Appendix 14 (hereinafter referenced as "JA".) A SDIRA is an investment vehicle that, unlike a traditional IRA, permits non-traditional investments in gold, real estate, etc.  Pursuant to a Consent Order, Sams filed a First Amended Complaint (JA 55) and subsequently, a Second Amended Complaint ("SAC") (JA 104), which is the subject of this appeal, against Defendants Entrust Arizona, LLC n/k/a Vantage Retirement Plans, LLC ("Entrust Arizona"), Juan Pablo Dahdah ("Dahdah"), The Entrust Group, Inc. ("TEG"), Entrust Administration, Inc. ("Entrust Admin"),  Hugh Bromma ("Bromma"), First Trust Company of Onaga ("Onaga"), and Mechanics Bank  ("Mechanics"). TEG, Entrust Admin, Entrust Arizona, Bromma and Dahdah are collectively referred to herein as "Entrust."

The SAC sought damages and injunctive relief arising from claims for breach of contract or, alternatively, rescission; conversion; fraudulent concealment; breach of fiduciary duty/constructive fraud; and Civil R.I.C.O (Sams has withdrawn her appeal of the Civil R.I.C.O claim). All Defendants moved to dismiss the SAC for failure to state a cause of action pursuant to Fed. R. Civ. P. 12 (b) (6). JA 197, 230, 254, 363.  The District Court granted the motion to dismiss of

2

all Defendants and Plaintiff filed the instant appeal. JA 422,425,427.

## B. Relevant Facts

Sams, an inexperienced investor, attended an investment seminar given by purported real estate investment guru, Michael Watson ("Watson"), in February of 2007. JA 115. Sams learned of Watson from her daughter, who had attended several of Watson's real estate investment seminars, where representatives of Defendants Entrust Arizona, TEG and/or Entrust Admin were present. Id.

From 2003 until December of 2011, TEG, a Delaware corporation, operated a "seamless" national franchise of at least 28 firms that provided SDIRA administrative and record keeping services under the name "Entrust." JA 113-114. Entrust Admin generated documents, SDIRA statements and marketing materials for Entrust SDIRAs. JA 114. Bromma is the CEO and owner of TEG and Entrust Admin. Id. The Entrust national franchise firms referred to themselves collectively as "Entrust" in advertising and communications with the public including Sams. JA 114,126,127. Entrust Arizona is an Arizona limited liability company that was one of the Entrust licensees/franchisees from at least 2005 until December of 2011. Dahdah is the CEO and owner of Entrust Arizona. Id.

Mechanics is a California-based bank, identified in Entrust contracts and

3

correspondence, as the Entrust SDIRA Custodian for all Entrust SDIRAs from May of 2009 until June of 2010. Id. Onaga is a limited purpose trust company chartered under the laws of the state of Kansas, identified in Entrust correspondence and SDIRA contracts, as the Entrust SDIRA Custodian for all Entrust SDIRAs from June of 2010 until the end of 2011. JA 114-115.

Sams initially invested $50,000 cash with Watson and later invested $134,701 through an Entrust SDIRA, both evidenced by unsecured promissory notes. JA 116. Watson required his investors, including Sams, to use "Entrust" SDIRAs only. JA 106. Sams' two promissory notes were renegotiated in March of 2009 and matured in March of 2011. JA 116.

In May of 2008, Sams completed an Entrust SDIRA application with TEG. JA 115. Her SDIRA account was immediately transferred to Entrust Arizona where Watson's other victims SDIRA monies were held. JA 106. Sams' retirement monies were then wired to Entrust to open her SDIRA and then Entrust wired her SDIRA monies to an account controlled by Watson, the investment sponsor. JA 115.

Sometime after she opened her Entrust SDIRA, Sams learned that her $50,000 promissory note from Watson had been "rolled over" into her Entrust SDIRA as a SDIRA asset without her knowledge or consent. JA 116. This promissory note identified the "lender" as Sams and not Sams' SDIRA. Id. So

4

Sams' SDIRA held two unsecured promissory notes totaling approximately $193,156, although one promissory note had not been designated by Sams as a SDIRA asset. Id.

After Sams opened her Entrust SDIRA account, she began receiving Entrust SDIRA account statements. JA 116-117. International Bank and Trust ("IBT") was identified in Sams' initial SDIRA Custodian contract as the Custodian of Sams' SDIRA. JA 128-129, 206. IBT was a New Hampshire bank controlled by Bromma. JA 128-129. IBT became the subject of an investigation by New Hampshire banking regulators and was cited with gross violations of law including inappropriate marketing activities and high risks in SDIRA asset handling. JA 129. New Hampshire banking authorities were so critical of IBT's operations that it voluntarily surrendered its charter in July of 2009. JA 130.

The IBT SDIRA Custodial Agreement stated that the Depositor (Sams) agreed that income generated from uninvested cash in her SDIRA was to be retained by IBT as compensation for its services. IBT also reserved the right to change the Custodial Fee Schedule at its discretion upon thirty days notice. JA 207-208.

Because of IBT's unsure status, in May of 2008, TEG and IBT entered into an Agreement for Custodian Services with United Commercial Bank ("UCB") in San Francisco, California. JA 129-130, 242. This agreement provided that UCB

5

was designated as the Custodian and IBT was designated as the "Third Party Bank" (to further insulate IBT from regulatory scrutiny) for Entrust and UCB. JA 242. IBT was contractually delegated the responsibility for the Custodian's (UCB's) depository and audit functions. In addition, UCB delegated its other Custodian duties to TEG and the Entrust franchisees/licensees. JA 129-130.

Pursuant to the agreement between IBT, UCB, TEG, and the Entrust licensees/franchisees, IBT received the income from uninvested cash in the Entrust SDIRAS. JA 129. Both UCB and IBT had the discretionary power to deposit a portion of the interest earned on the uninvested cash into the Entrust SDIRAs. Id. However, UCB had regulatory problems of its own and in November of 2009, UCB was closed by the California Department of Financial Institutions as a failed financial institution, and the FDIC was named Receiver. Id. Both the IBT contract and the IBT/UCB contract stated that Sams' interest in her SDIRA assets was "nonforfeitable." JA 206, 242.

In May of 2009, Dahdah, on behalf of Entrust Arizona and TEG, sent a letter to his clients, including Sams, advising them that Mechanics was going to be providing the Custodian services for Entrust. JA 173. Dahdah's letter stated that having Mechanics serve as the Entrust Custodian provided Sams with "the financial security you expect." Id.

In June of 2009, Defendant Mechanics was identified in Entrust SDIRA

6

Custodian contracts and documents to Sams as the new Entrust Custodian. JA 130-131, 368.  Mechanics, Entrust Arizona, TEG, Entrust Admin, Bromma and Dahdah had struck a "back door" contractual deal, whereby Mechanics delegated all of its Custodian duties to Entrust.

Mechanics' Custodial Agreement stated that the SDIRA accounts were established for the "exclusive benefit of the owner." JA 368. Mechanics' Custodial Contract further stated that Sams' interest in the balance of the SDIRA was "nonforfeitable.**" Id. However, the Mechanics Custodial Agreement provided that all interest on uninvested cash *goes to Mechanics* who <u>*may*</u> pass through some of the interest to Sams or the other (Entrust) administrators **at Mechanics' sole discretion.** JA 370, ¶ 8.11 (b). Mechanics' SDIRA contract stated that Sams' interest in her SDIRA was "nonforfeitable." JA 368.

In late 2009 or early 2010, Mechanics was notified by the Federal Deposit Insurance Company ("FDIC") as well as the California Department of Finance ("CDIF") that it was going to be examined as the Entrust SDIRA Custodian. JA 132. The FDIC, in a letter to Bromma in May of 2010, told Bromma that the contractual delegation of Mechanics' (a FDIC institution) Custodian duties to Entrust Admin subjected Entrust Admin to the supervisory authority of the FDIC. JA 169.

Because of Mechanics' delegation of the SDIRA Custodian (and banking)

duties to Entrust Admin, the FDIC threatened to take Mechanics' bank charter (JA 132, 181); the FDIC forced Mechanics out as the Entrust Custodian (Id.); Mechanics was subject to an examination by the FDIC (Id.); the FDIC threatened to require Mechanics to distribute all SDIRA assets of all Entrust SDIRAs to its customers which would have voided all of the SDIRAs (Id.); and the FDIC determined that Mechanics had violated banking laws by delegating its banking and SDIRA Custodian functions to Entrust Admin without the required FDIC approvals. JA 132-133. Initially, the FDIC told Mechanics that they would have to exit the SDIRA Custodian business by December 31, 2010; however, in May of 2010, the FDIC gave Mechanics one month to step down as the Entrust Custodian. JA 132.

In June of 2010, TEG executed a Custodian agreement with Onaga. JA 135. Noticeably absent from the Onaga Custodial contract with TEG ("Onaga Custodial Contract") was any mention of the fees to be taken from interest earned on investment of SDIRA uninvested cash. Id. The Onaga Custodial Contract simply stated that Onaga would receive $20 per SDIRA account per year while named as the Entrust Custodian. Id. However, the Onaga (Form 5305-A) Traditional Individual Retirement Custodial Account Agreement (the agreement used with ENTRUST SDIRA clients) gave TEG and Onaga the right to invest any SDIRA uninvested cash in cash pools, a common trust fund or other accounts

8

as directed by TEG and Onaga and gave Onaga the right to keep any interest earned on the investment of SDIRA uninvested cash. JA 135-136. The Onaga Form 5305-A Agreement further stated that Onaga could pay the interest on uninvested cash to the Administrator (TEG) or the Administrator's designee "for its undirected cash management services."  Id.

Sams also received a letter in May of 2010 from TEG advising her that regulators had "recently increased the demand" for all SDIRA assets to be held in custody with the designated Custodian, in lieu of a "nominee" such as Entrust. JA 179. **The letter stated that <u>regulators were beginning to require that those custodians perform fair market valuations on all IRA assets</u> and that they "thoroughly review" the nature of the assets that are not publicly traded.** Id.

Sometime around the third quarter of 2010, Onaga came under scrutiny by the Kansas Banking Division. JA 136. At that time, Kansas banking authorities mandated that all assets and original documentation evidencing the investments made by the Entrust SDIRAs be held solely by Onaga. Id. Onaga remained the Custodian for Entrust until approximately December of 2011 when the Entrust franchise was dissolved.  JA 113.

Sams' SDIRA statements from 2009 until the third quarter of 2012 indicated that her SDIRA had a fair market value ("FMV") of approximately $199,000 and that the SDIRA assets were "not categorized."  JA 117. Sams

received Fair Market Valuation forms for her SDIRA from Entrust in 2010 and 2011. Id. These forms stated that TEG is "required to provide you with the Fair Market Value of your account as of December 31st of each year." JA 118.

In 2011, Watson was charged by the SEC with selling illegal securities in a Ponzi scheme. JA 107. Watson declared bankruptcy in 2012 (JA 107). Plaintiff thereafter filed the underlying action and the instant appeal.

## STANDARD OF APPELLATE REVIEW

The district court dismissed the SAC against all Defendants pursuant to Rule 12(b) (6) for failure to state a claim on which relief could be granted. This Court's review of the district court's grant of a motion to dismiss is *de novo,* focusing only on the legal sufficiency of the complaint. *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir.2008). In reviewing such a dismissal on appeal, this Court must accept the facts alleged in the SAC as true and construe them in the light most favorable to the Plaintiff. See, *Flood v. New Hanover Cnty.*, 125 F.3d 249, 251 (4th Cir. 1997).

Where the allegations in a complaint sound in fraud, the plaintiff must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b) requires that Plaintiff *must* allege "the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation

and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 3d* § 1297, at 590 (2d ed. 1990). However, Rule 9(b) permits "intent, knowledge, and other conditions of a person's mind [to] be alleged generally."  Fed. R. Civ. P. 9(b).

## SUMMARY OF THE ARGUMENT

There was no lawful SDIRA Custodian that intended to perform the duties of same at the time Sams entered into the SDIRA Custodian contracts with each of the Defendants.  Because of that, theses SDIRA contracts lacked the mutual assent of the parties thus making the contracts void *ab initio*.

The contracts executed between Entrust and IBT, Mechanics or Onaga unavoidably prove that none of the Defendants intended to act as passive SDIRA administrators and custodians. Defendants created contracts that illegally gave them the right to self-deal in and steal SDIRA assets that belonged to the SDIRA and should have been taxable distributions under the Internal Revenue Code.

Once regulators began examining Entrust's conduct, Entrust tried to cover themselves by sending out documents with misrepresentations about "changes" in the law concerning the duties of a SDIRA Custodian. But there were no actual changes. Sams was unaware of all of the Defendants' illegal activity, fraudulent misrepresentations, and intentional circumvention of the law governing SDIRA

11

Custodians. If Sams had known of Defendants' illegal conduct, she never would have made the investment through Defendants with Watson, would not have maintained a SDIRA with any of these Defendants, and she would not have lost her life savings.

## ARGUMENT

**I. The district court erred in dismissing the Second Amended Complaint for failure to state a cause of action for breach of contract or, alternatively, rescission since Sams' Custodial contracts with Defendants were void *ab initio* because they lacked a lawful Self-Directed IRA ("SDIRA") Custodian; there was no mutual assent of the parties to the terms of the SDIRA Custodial contracts; and the Defendants did not to intend to and did not act as "passive" SDIRA Custodians and administrators.**

This case presents several issues of first impression for this Court. The first is whether a SDIRA and its underlying custodial contract are valid when there is no lawful SDIRA custodian performing the legal duties required by law and the SDIRA contract. The second issue of first impression is whether a SDIRA contract is valid where there was no mutual assent of the parties to the terms of the SDIRA custodial contract, and the respective SDIRA Custodians and administrators did not intend to and did not act as "passive" Custodians and administrators.

12

## A. The Defendants' SDIRA contracts lacked a lawful Self-Directed IRA ("SDIRA") Custodian.

The district court held that Sams failed to allege any facts supporting a claim against Defendants for breach of contract. JA 422. The district court did not address Sams' claim for rescission. Id. The district court found that Defendants had complied with the terms of their SDIRA contracts. Id. However, the district court did not address the fact that TEG, Entrust Admin and Entrust Arizona lacked the authority to provide the services they (allegedly) were providing to Sams which had been illegally delegated to them by IBT, Mechanics and Onaga and for which they charged fees. JA 194-195. The district court ignored the findings of the FDIC who determined that the conduct of Entrust and Mechanics violated IRS and banking laws and regulations. JA 168-170.

TEG, Entrust Admin and Entrust Arizona were never legally approved or authorized SDIRA Custodians. As a result, they could not legally hold title to SDIRA assets, investments and property, could not issue SDIRA funds for investments, and could not perform any of the other duties of the Custodian set forth in the SDIRA contract and required under the Internal Revenue Code. JA 194-195. Sams paid for SDIRA Custodian services by these Defendants that were never performed by a lawful SDIRA Custodian.

Entities seeking to serve as SDIRA Custodians, who are not banks or trust

13

companies, must get approval and licensure from the Internal Revenue Service ("IRS") to serve as non-bank Custodians. Entrust agrees. JA 192.  A SDIRA is still an IRA, which is a custodial account, and **still has to be treated as a trust in order for it to qualify as an IRA under section 408.**  T*aproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 207 (2009) aff'd 679 F.3d 1109 (9th Cir. 2012). Both Bank Custodians and Non-Bank IRS Approved Custodians are considered "Trustees" under 26 CFR 1.408 (b) (2) which states:

> *Trustee. (i) The trustee must be a bank (as defined in section 408(n) and the regulations thereunder) or another person who demonstrates, in the manner described in paragraph (e) of this section, to the satisfaction of the Commissioner, that the manner in which the trust will be administered will be consistent with the requirements of section 408 and this section.*

In 26 U.S.C. 408 (a) concerning Individual Retirement Accounts ("IRAs"), it is stated:

> *(a) **Individual retirement account***
>
> *For purposes of this section, the term "individual retirement account" means a trust created or organized in the United States <u>for the exclusive benefit of an individual or his beneficiaries</u>, but only if the written governing instrument creating the trust meets*

14

*the following requirements:*

*(1) Except in the case of a rollover contribution described in subsection (d)(3) in* <u>[1]</u> *section* <u>402 (c)</u>, <u>403 (a)(4)</u>, <u>403 (b)(8)</u>, *or* <u>457 (e)(16)</u>, *no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable year on behalf of any individual in excess of the amount in effect for such taxable year under section* <u>219 (b)(1)(A)</u>.

*(2)* <u>The trustee is a bank</u> *(as defined in subsection (n))* <u>or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirements of this section.</u>

*(3) No part of the trust funds will be invested in life insurance contracts.*

*(4)* <u>The interest of an individual in the balance in his account is nonforfeitable.</u>

*(5) The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.*

*(6) Under regulations prescribed by the Secretary, rules similar to the rules of section* <u>401 (a)(9)</u> *and the incidental death benefit*

15

*requirements of section 401 (a) shall apply to the distribution of the entire interest of an individual for whose benefit the trust is maintained.*

Certain facts are undisputed here. There are a continuous series of SDIRA Custodian contracts between Sams and the Defendants which, for example, attempt to exculpate Defendants from any and all liability in any circumstances whatsoever. The problem is that these contracts are illegal and unconscionable and they violate IRS rules and regulations, as well as public policy. The SDIRA documents given to Sams were all provided by Entrust, Mechanics, or Onaga and were Defendants' standardized form contracts that were entered into by all Entrust SDIRA account holders. All of the contracts between Sams and the Defendants were drafted in their entirety by Defendants. These non-negotiable contracts were presented on a take-it-or-leave-it basis to Sams and were not drafted, amended or negotiated in any way by Sams.

Since the contracts themselves either have been breached or are subject to rescission, the district court's reliance upon them to exculpate Defendants is misplaced. Furthermore, the legal challenges here do not pertain to the *administrative* functions of the Defendants; they pertain to the *SDIRA Custodian and banking functions* which they illegally undertook, without proper qualification and without the knowledge or consent of Sams. The district court

16

ignored all of those allegations in the SAC.

Defendants, even before they executed SDIRA adhesion contracts with Sams, knew they were going to violate those agreements, which required that the SDIRA assets be held for the "exclusive benefit" of the SDRIA owner and required that the SDIRA assets were "nonforfeitable" as to the SDIRA owner. There is no authority for the legal proposition that a contract is valid when the drafters/contracting parties (Defendants) tender their contract to the other contracting party (Sams), with the preconceived intent and plan to violate the terms of the contract.

Even though Sams was an inexperienced investor, had she known that her life savings was going to be placed in a SDIRA being administered under an illegal contract in violation of IRS regulations and banking laws, that Defendants would knowingly transfer her SDIRA funds to the investment sponsor in violation of IRS regulations, that her SDIRA was without a lawful SDIRA Custodian, and that non-SDIRA assets had been converted into SDIRA assets illegally by Defendants, she would never have made the investment.

Watson and Entrust had a symbiotic relationship.  Watson required his investors to use "Entrust" SDIRAs.  In return Entrust, while claiming to be "passive," gave Watson credibility by having their representatives appear at his investment seminars.  Entrust's actions gave Watson the proverbial "stamp of

approval" thus removing any concerns Sams might otherwise have had about investing with Watson

In *Smith v. Copeland*, 2010 U.S. Dist. LEXIS 51157 (N.D. Ga. May 21, 2010), Defendant Onaga, among others, was accused of aiding and abetting a Ponzi scheme as the SDIRA custodian for all of the fraudsters' victims. The plaintiffs in *Smith* alleged that Onaga's SDIRA contract was procured by fraud, unenforceable against public policy, and unconscionable. (*Smith* at pg. 6.)  The district court agreed, noting that the complaint alleged that Onaga had been selected by the fraudsters in *Smith* as the only SDIRA Custodian that their victims could use, "**because of its (Onaga's) participation in previous Ponzi Schemes."** (*Smith* at pg. 6.)

There are ample allegations in the SAC supporting Sams' claim that she was duped into signing an illegal, adhesion SDIRA contract with material misrepresentations and terms that Defendants never intended to comply with thus making the contract void ab *initio*, against public policy and unconscionable. For these reasons, the order dismissing Plaintiff's claim for breach of contract/ rescission against Defendants was error and should be reversed.

**B. There was no mutual assent by the parties to the terms of the SDIRA Custodian contracts.**

Under Maryland law, "[t]he formation of a contract requires mutual assent

18

(offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.,* 392 F.3d 114, 123 (4th Cir. 2004), citing *Peer v. First Fed. Sav. and Loan Ass'n of Cumberland,* 331 A.2d 299, 301 (Md. 1975). The SAC alleges facts establishing that the SDIRA contracts entered into between Sams and Defendants lacked mutual assent, a meeting of the minds, and consideration. JA 128-137. The SDIRA Custodian contractual terms fraudulently misrepresented to Sams the true identity of the entities performing the duties of the "Entrust SDIRA Custodian" and did not disclose the related "back door" deals between Entrust and IBT, Mechanics or Onaga. Id.

Sams entered into the SDIRA Custodian contract (and all subsequent Custodian contracts) believing that the "identified" "passive" Custodian was actually performing those functions in a legally compliant manner. In fact, Defendants TEG, Entrust Admin, Bromma, Dahdah, Entrust Arizona, Mechanics and Onaga never intended to act within their lawful roles.

Sams was conned by Defendants into entering an illusory, adhesion contract filled with fraudulent misrepresentations about the services to be provided. Therefore there was no meeting of the minds between Sams and Defendants as to the contractual intent of the parties and Sams received no consideration from Defendants. For these reasons, the district erred in dismissing

19

the claim for breach of contract/rescission against Defendants and this order should be reversed.

## C. Defendants never intended to and did not act as "passive" SDIRA Custodians and administrators.

SDIRA Custodians are required by law to be passive and each of the SDIRA contracts stated that the Custodian was a passive Custodian not providing any type of investment advice. See, for example, JA 208-209, 244-245. Otherwise, the SDIRA is simply an IRA. However, the SDIRA contractual documents used by Entrust, IBT, UCB, Mechanics and Onaga establish the intent of all of them to self-deal in Sams' uninvested SDIRA cash assets and take most or all of the profits for themselves as hidden, excessive fees while eliminating Sams' legal and contractual right to control the investment of her SDIRA assets. Yet Defendants stated their conduct was purely "passive." JA 175, 208-209.

The internal inconsistency of the contracts, combined with the "back door" deals among the Defendants acting in concert in direct violation of the SDIRA Custodian contracts Sams was required to agree to, result in the contracts being void *ab initio*. Because Defendants' contracts were void at their inception, Defendants, as administrators, investment managers and Custodians of Sams' retirement monies, were by law fiduciaries of Sams' SDIRA assets.

Sams' uninvested SDIRA cash was not controlled by Sams. SDIRA

interest is not tax exempt. As acknowledged in Defendants' SDIRA contracts and disclosures, there are tax penalties on the taking of early distributions in a SDIRA (JA 185, 215, 378) and all distributions must be reported. JA 383. There is no legal authority permitting Defendants' taking of SDIRA assets. In fact, receiving unreasonable compensation for managing a SDIRA is a "prohibited transaction" under the IRC. JA 185.

26 C.F.R. 1.408-2(e)(6)(i) states in pertinent part:

> …A trustee is a passive trustee only if under the written trust instrument the trustee has no discretion to direct the investment of the trust funds or any other aspect of the business administration of the trust, but is merely authorized to acquire and hold particular investments specified by the trust instrument….

Defendants illegally assumed investment discretion and control of SDIRA assets to take additional, excessive, undisclosed fees in their "assumed" (but unlawful) role of SDIRA Custodian. (SAC ¶¶ 10-11,129-131,140, 146). Sams paid fees to Entrust, IBT, Onaga and/or Mechanics for SDIRA services that were either not performed, were out of compliance or were illegally delegated to others. As a result, the district court erred in finding that the SAC did not state a cause of action for breach of contract or, alternatively, rescission and its decision should be reversed.

**2. Whether the district court erred in finding that the substantive allegations in the Second Amended Complaint failed to state a cause of action for conversion, fraudulent concealment, and breach of fiduciary duty/constructive fraud.**

A. *Plaintiff's Claim for Conversion States a Cause of Action*

The district court held that Plaintiff failed to state a claim for conversion because none of the defendants exercised dominion or control over Plaintiff's investments with Watson. However, the SAC specifically alleges that after Sams opened her Entrust SDIRA, she learned that her earlier $50,000 cash investment through an unsecured promissory note from Watson had been "rolled over" into her Entrust SDIRA **without her knowledge or consent**. This promissory note identified the "lender" as Sams personally and not Sams' SDIRA.

This promissory note was illegally converted by the Defendants (discovery will reveal which Defendants) into an asset of Sams' SDIRA without Sams' knowledge or consent. Such a conversion is impermissible under the laws and regulations governing SDIRAs which require that the decision as to what investments are  made by the SDIRA is subject to the sole discretion of the SDIRA owner.  Passive Custodians have no right to direct the investments in SDIRAs, they are merely authorized to acquire and hold the particular investment identified in the SDIRA instrument. 26 C.F.R. 1.408-2(e)(6)(i).

Sams never directed that this $50,000 promissory note be held in her SDIRA. Defendants unilaterally and illegally exercised that investment discretion with Sams' SDIRA. Under Maryland law, such facts state a claim for conversion and the district court's order to the contrary was error and should be reversed. *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249 (Md. 2004).

**B.** ***Plaintiff's Claims for Breach of Fiduciary Duty/Constructive Fraud and Fraudulent Concealment State a Cause of Action***

The district court determined that Plaintiff's claim for fraudulent concealment failed because there was no duty by the Defendants to disclose a material fact to Sams and Defendants had no confidential or fiduciary duty to Sams giving rise to such a duty. The district court also opined that SDIRA "administrators and consultants" have no duty to determine the fair market value of a SDIRA. Sams does not disagree with that statement. However, the district court mischaracterizes Sams' argument below which was that **the SDIRA Custodian,** not a consultant or administrator as the district court states, **has a duty to determine the fair market value of SDIRAs annually and Entrust admitted that in its regulatory disclosure to Sams**. JA 179.

Maryland law recognizes a cause of action for constructive fraud (Count V of the SAC) where a relationship of trust and confidence exists. *Crawford v. Mindel*, 57 Md. App. 111, 120 (1984); or where one party is justified in believing

23

and relying on the fact that the other party will not act in a manner adverse or inconsistent with the other party's interest or welfare and a resultant violation of that belief. *Midler v. Shapiro*, 33 Md. App. 264, 364 A. 2d 99 (1976); and where the defendant's conduct deceives, violates a confidence, or injures the public interest all constitute the elements of a claim for constructive fraud under Maryland law. *Scheve v. McPherson*, 44 Md. App 398, 406 (Md. Ct. Spec. App. 1979 quoting 37 C.J.S. Fraud, §2c (pgs. 211-212).

Sams placed her SDIRA assets under Defendants' supervision and safe-keeping based upon their representations that they were passive, compliant, knowledgeable SDIRA administrators and Custodians. Defendants had superior knowledge and information concerning the nature of the investments held in her account and the account transactions. Plaintiff placed her trust in the Defendants to accurately report on account statements the transactions made, and the assets held in her account. Defendants, by virtue of their superior knowledge and position of control as well as the confidence and trust placed in them by Sams, owed a duty of loyalty to her. Defendants also owed a duty of disclosure in connection with carrying out their duties to Sams which they knowingly violated.

SDIRAs have restrictions on permitted transactions and who can receive SDIRA assets. Internal Revenue Code § 4975 prescribes the investments that are permitted by SDIRAs and those that are "Prohibited Transactions." Entrust knew

before Sams entered into the SDIRA contract with them that Sams' SDIRA

transaction with Watson was illegal as a Prohibited Transaction because Entrust

knew Watson was the seller of the investment to Sams ("investment sponsor")

and as such he was a "Disqualified Person" who is not permitted to receive

SDIRA assets under Internal Revenue Code ("IRC") §4975 (e)(2).

A "Disqualified Person," who cannot receive SDIRA assets pursuant to

IRC §4975 (e) (2) (A) and (B) includes a fiduciary and a person providing

services to the plan. A fiduciary is defined in §4975 (3) as any person who—

> *(A) exercises any discretionary authority or discretionary control*
>
> *respecting management of such plan or exercises any authority or*
>
> *control respecting management or disposition of its assets,*
>
> *(B) renders investment advice for a fee or other compensation,*
>
> *direct or indirect, with respect to any moneys or other property of*
>
> *such plan, or has any authority or responsibility to do so, or*
>
> *(C) has any discretionary authority or discretionary responsibility in*
>
> *the administration of such plan.*

Watson, TEG, Entrust Admin, Bromma, Dahdah, Mechanics, IBT and Onaga

were all fiduciaries of Sams' SDIRA as well as Disqualified Persons and as such

were not permitted to accept SDIRA assets. Each transaction in which they

received SDIRA assets (or interest from SDIRA assets) was a separate Prohibited

Transaction. SDIRAs with Prohibited Transactions cease to be SDIRAs at all (retroactively) as of the first day of the calendar year in which the Prohibited Transaction occurs pursuant to 26 U.S.C. §408(e)(2)(A).

Custodians must report the accurate fair market value ("FMV") of the SDIRA assets under their management annually on IRS Form 5498 and report the value of any distributions to the SDIRA owner on Form 1099-R**.**   JA 125. Beginning in 2013 the Instructions for Form 5498 were modified to state: "***Trustees and custodians are responsible for ensuring that all IRA assets (including those not traded on established markets or with otherwise readily determinable market value) are valued annually at their fair market value.***" Id. This new reporting requirement was not implemented pursuant to any changes in IRS laws or regulations because Custodians had always had the responsibility under the IRC to report the fair market value of SDIRA assets under their custody. Each Form 5498 is filed with an IRS Form 1096. Id.   Form 1096 requires that the filer (the SDIRA Custodian) sign **under penalty of perjury** that the information contained within the attachment is true, correct and complete. Id.

Defendants had a duty to disclose their "back door" agreements to Sams, the fact that her SDIRA transaction with Watson was illegal as a Prohibited Transaction, the actual fair market value of her SDIRA (which would have alerted Sams to Watson's fraud and may have permitted her to recover some or

all of her investment) as well as their investment of Sams' SDIRA assets and collection of excessive, hidden fees which were also Prohibited Transactions. See, *Barnett Bank of West Florida v. Hooper*, 498 So. 2d 923 (Fla. 1986).

In *Patsos v. First Albany Corp*., 433 Mass. 323 (2001), the Massachusetts Court (citing cases from around the country), noted that a court should look at several factors when determining whether a broker/investment advisor/manager is a fiduciary. Those factors include: **i.** *the discretion given the broker such that the client's prior approval is not necessary for the broker to execute a transaction*-here while claiming to be passive, Defendants had discretion and control over Plaintiff's SDIRA uninvested cash without her knowledge or consent; **ii.** *whether the client has a lack of investment acumen*-here Sams is an unsophisticated investor**; iii.** *whether the investment advisor holds themselves out as an expert*- here Defendants held themselves out as SDIRA experts (JA 174); and **iv.** *whether the investment advisor exercises ultimate control over the investment assets*-here Defendants served as self-dealing investment advisors who had total discretion as to distribution of any SDIRA investment profits. *Patsos* at 331-336. The analysis under *Patsos* is a fact-intensive one, therefore inappropriately resolved by a Motion to Dismiss, yet results in a finding that Defendants acted as fiduciaries.

The SAC more than meets the specificity requirements of Fed.R.Civ.P. 9

27

(b) which requires a plaintiff to plead with particularity the circumstances constituting fraud. Sams has alleged what was misrepresented, why, by whom, when and where. In addition the SAC sets forth each of these misrepresentations contained in the form documents prepared by Defendants and tendered to Sams. These form documents were prepared for the benefit of all of the Defendants at various points in time.

The district court ignored all of the indicia of fraud by Defendants set forth in the SAC including**: i.** that Defendants claimed to Sams that they were "passive" Custodians while concealing the fact that they were actually serving as fiduciaries/investment managers of Sams' Entrust SDIRA uninvested cash assets; **ii.** that Defendants concealed from Sams that she paid for SDIRA Custodian services that either were never performed or were out of compliance; **iii.** that Defendants concealed that they engaged in Prohibited Transactions both for themselves and with Watson thus making Sams' SDIRA void ab *initio;* i**v.** that Defendants concealed that each year they filed fraudulent, inaccurate, and/or unverified Form 5498s (declaring the FMV of the assets in Sams' SDIRA under penalty of perjury) with the IRS; **v.** that Defendants concealed that Sams' SDIRA lacked a lawful custodian. Defendants' silence and/or nondisclosure in the face of a duty to disclose are tantamount to an affirmative misrepresentation.

This Court is able to glean from the SAC exactly the time of the alleged

fraud, the exact false representations that were made, the identity of the Defendants making the misrepresentations and the result of the misrepresentations. Sams' fraud complaint is not the type of "frivolous action" that Rule 9 (b) was designed to avert. See, *McCauley v. Home Loan Investment Bank,* 710 F. 3d 551, 560 (4th Cir. 2013.) For these reasons, the district court's order dismissing Sams' SAC against all Defendants for breach of fiduciary duty/constructive fraud and fraudulent concealment should be reversed.

## CONCLUSION

Plaintiff respectfully requests that this Court reverse the decision of the district court and hold that the district court erred in dismissing the SAC for failure to state a cause of action based upon Plaintiff's claims for breach of contract/rescission, breach of fiduciary duty/constructive fraud and fraudulent concealment.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument in this case of first impression as to the issue of the viability of a SDIRA contract without a lawful custodian and the issue of whether a SDIRA administrator/record

keeper/custodian is "passive" if they exercise investment discretion over SDIRA assets and take undisclosed profits from the SDIRA.

 Respectfully submitted this 10th day of September, 2014

 **/s/ Cathy J. Lerman**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** <u>14-1722</u>          **Caption:**  Sams v. Entrust Arizona, LLC

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief  complies with the type-volume limitation of Fed.  R.  App.  P. 28.1(e) (2) or 32(a) (7) (B) because:

☑        this brief contains        <u>6784</u>      [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a) (7) (B) (iii), *or*

☐        this brief uses a monospaced typeface and contains_____[*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a) (7) (B) (iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑        this brief has been prepared in a proportionally spaced typeface using
<u>Microsoft Word 2007</u>          [*identify word processing program*] in
<u>14 Point Times New Roman</u>          [*identify font size and type style*]; **or**

☐        this brief has been prepared in a monospaced typeface using
_____[*identify word processing program*] in
_____[*identify font size and type style*].

<u>(s) Cathy J. Lerman</u>

<u>Attorney for Appellant</u>

Dated: <u> September 10, 2014</u>

# CERTIFICATE OF SERVICE

I certify that on September 10, 2014 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Cathy J. Lerman _____                  September 10, 2014 _____

   Signature                                                                Date